James J. Glenn and Mary L. Glenn, et al. [1] v. Commissioner. Glenn v. Commissioner
Docket Nos. 837-67, 838-67, 847-67, 888-67.
United States Tax Court
T.C. Memo 1970-184; 1970 Tax Ct. Memo LEXIS 173; 29 T.C.M. (CCH) 833; T.C.M. (RIA) 70184; June 30, 1970, Filed *173 1. Held, the amounts paid in 1960 and 1961 by the petitioner-company as salaries and bonuses to each of its officers (Bradt, Glenn, and Killian) constituted reasonable compensation for services rendered and are deductible under sec. 162(a)(1), I.R.C. 1954. 2. Held, a portion of the traveling, entertainment, and gift expenses of Bradt, Glenn, and Killian which were paid by the company represented personal expenses of these individuals and were not proximately related to corporate business; therefore, these personal expenses are nondeductible by the company and includable in the gross income of the individuals. The remaining portion of the expenses of this type were ordinary and necessary business expenses which are deductible by the company under sec. 162(a), I.R.C. 1954. 3. Held, Glenn made charitable contributions in 1960 and 1961 which are deductible under sec. 170(a), I.R.C. 1954 in the total amounts of $569 and $752, respectively. 4. Held, respondent's disallowance of Glenn's deduction of an alleged casualty loss in 1961 under sec. 165(c)(3), I.R.C. 1954 is sustained because Glenn failed to carry his burden of proving that a loss actually occurred. Robert C. Duffy, Jr., 1938-42 *174 Philadelphia National Bank Bldg., Philadelphia, Pa., and William G. O'Neill, 14th Floor, Packard Bldg., Philadelphia, Pa., for the petitioners. Steven P. Cadden for the respondent. 834 HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following deficiencies with respect to petitioners' income taxes: *10
Deficiency
1960
1961
James J. Glenn and Mary L. Glenn, Docket No. 837-67
$ 1,237.59
$ 790.85
Glenn-Killian Color Com- pany, Docket No. 838-67
18,803.31
7,814.06
Herbert Bradt and Irene P. Bradt, Docket No. 847-67
1,134.80
388.43
James T. Killian and Mar- jorie A. Killian, Docket
No. 888-67
1,396.72
1,807.38
These cases were consolidated for trial and opinion. Some of the issues have been conceded by petitioners, and the issues remaining for our decision are as follows: (1) Whether the amounts paid by the petitioner-company as salaries and bonuses to each of its officers (petitioners Bradt, Glenn, and Killian) are deductible as reasonable compensation for services rendered under sec. 162(a)(1), I.R.C. 1954. (2) Whether certain traveling, entertainment, and gift expenses of each of these officers, paid by the company in 1960 and 1961, are deductible by the company as *175 ordinary and necessary business expenses under sec. 162(a), I.R.C. 1954; or whether these expenses, or any portion thereof, represented the personal expenses of the officers, the payment of which is nondeductible by the company and includable in the gross income of the officers for whom the payment was made. (3) Whether in 1960 and 1961 petitioner Glenn made certain deductible charitable contributions under sec. 170(a), I.R.C. 1954, in excess of the amount allowed by respondent. (4) Whether petitioner Glenn incurred a deductible casualty loss within the meaning of sec. 165(c)(3), I.R.C. 1954, for the destruction of a television antenna in a windstorm in 1961. Findings of Fact Some of the facts have been stipulated and are so found. The stipulations and exhibits thereto are incorporated herein by this reference. Petitioners James J. and Mary L. Glenn are husband and wife, as are petitioners James T. and Marjorie A. Killian, and petitioners Herbert and Irene P. Bradt. At the time of the filing of their petitions herein the Glenns resided in Wayne, Pennsylvania, the Killians resided in Valley Forge, Pennsylvania, and the Bradts resided in Medford Lakes, New Jersey. Each couple filed *176 joint income tax returns for the years 1960 and 1961 with the district director of internal revenue, Philadelphia, Pennsylvania. The Glenn-Killian Color Company, also a petitioner herein, is a corporation which was organized on February 11, 1946, under the laws of the Commonwealth of Pennsylvania; at the time of the filing of its petition herein, its principal office was in Philadelphia, Pennsylvania. The said company's United States corporation income tax returns for the taxable years 1960 and 1961 were filed on the accrual basis with the district director of internal revenue, Philadelphia, Pennsylvania. James J. Glenn (hereinafter referred to as "Glenn") and James T. Killian (hereinafter referred to as "Killian") became friends at the Massachusetts Institute of Technology where they were both majoring in physics. Prior to graduation, they collaborated on a thesis concerning the physical measurement of color. In this thesis, they made spectrophotometric measurements of the "Munsell Color System," the latter being a set of colors which Munsell had classified in terms of hue, brightness, and purity. The end result of the thesis was the establishment of a mathematically determined standard *177 for the measurement of the colors in the Munsell system. Glenn and Killian both graduated from M.I.T. in 1935 with a Bachelor of Science degree in physics. After graduation, Glenn worked for the Color Instrument Corporation in New York City, New York, where he was engaged in the development of electronic instruments for the physical measurement of color. In January, 1937, he went to work for Shelton Looms in Shelton, Connecticut, where his main duty was to obtain an "automatic record" from a spectrophotometer, the most advanced instrument for the physical measurement of color. He used the spectrophotometer for "color control and control research, and to interpret the results of the physical measurements." Glenn was in the Navy from the spring of 1942 until December 1945. After his graduation in 1935, Killian worked for a year on the instructing staff at M.I.T. 835 Then he worked for a year in Chicago, Illinois, for Sears, Roebuck and Company in a research laboratory. Subsequently, he worked for two years for the Container Corporation, Philadelphia, Pennsylvania, where he was in charge of ink. During the ensuing six-year period he worked for the Pope & Gray Company, an ink company *178 in New York. On February 11, 1946, Glenn and Killian organized and incorporated the Glenn-Killian Color Company (hereinafter referred to as "the Company"). The Company has been primarily engaged in the manufacture and sale of printing inks. Glenn and Killian have been employees of the Company since its organization. When the Company was first started, Killian had had a considerable amount of experience in both making and selling ink. Although Glenn had a background in color, he did not know how to manufacture ink, and it was necessary for Killian to teach Glenn this aspect of the business. After he received this preliminary training, Glenn worked for some time almost exclusively "on the inside" manufacturing the ink; during this same period Killian was primarily involved with selling the ink. During the first few years the Company only had one other employee. Herbert Bradt (hereinafter referred to as "Bradt") became an employee of the Company in 1952. Prior to that time he had been a lithograph printing specialist and had been the superintendent of one of the largest offset printing plants in Philadelphia, Pennsylvania. During his first few years with the Company, Bradt did some selling *179 "on the outside," but spent most of his time working in the laboratory, where he was engaged in research and development. Soon after he was employed, Bradt suggested that sales would be increased if the Company adopted some sort of color catalogue containing all the popular colors used by the printing industry. During the following three-year period, Glenn and Killian enlarged on this idea and developed the "Offset Color Formulator" which was both a color catalogue and a color matching system. They were able to develop this system because of their prior experience in the field of color measurement. This new color system enabled printers who were customers of the Company to make, by themselves, any one of about 575 colors of ink. The printers would buy eight "standard" colors of ink, plus black and white, and mix them according to the exact proportions which were set forth on the color cards in the "Offset Color Formulator" The system enabled the printers to match almost any color which they needed in a hurry. The color matching system was a significant contribution to the success of the business. Not only was the system widely accepted by the printing industry, but it was subsequently *180 adopted by most of the other ink manufacturers. The gross receipts of the Company from 1946 through 1961 were as follows: Year
Gross Receipts
1946
$ 31,832.05
1947
30,552.22
1948
33,798.51
1949
41,806.08
1950
70,714.37
1951
119,363.18
1952
148,007.51
1953
197,465.7 3
1954
226,494.67
1955
247,182.49
1956
320,217.01
1957
347,884.60
1958
414,844.07
1959
489,459.91
1960
579,044.30
1961
594,461.25
During the taxable years 1960 and 1961, Glenn, Killian, and Bradt each owned eight shares, or 32 percent of the 25 outstanding shares of common stock of the Company. The remaining share was owned by J. R. Pie, who did not work for the Company. During those years Killian served as president of the corporation, Bradt served as vice president, and Glenn was the secretary - treasurer. These three men were also the only directors of the corporation. During 1960 and 1961, Glenn, Killian, and Bradt were the only managers of the Company and were each involved in all of the major functions of the corporate business - production, research and development, and sales. However, during those years Glenn was primarily responsible for production, Killian was primarily concerned with sales (he spent about half of his time "on the outside" contacting *181 customers), and Bradt was primarily responsible for research and development. During the years 1946 through 1966, Glenn, Killian, and Bradt were employed full time and received salaries, bonuses, and commissions from the Company as follows: 836 J. J. Glenn
J. T. Killian
H. Bradt
1946
$ 1,650.00
$ 1,650.00
1947
3,850.00
3,850.00
1948
4,060.00
4,060.00
1949
5,055.00
5,055.00
1950
5,555.00
5,055.00
1951
6,075.00
6,175.00
1952
6,175.00
6,175.00
$ 5,850.00
1953
8,200.00
8,200.00
8,400.00
1954
14,026.17
14,026.17
8,680.00
1955
14,734.15
14,734.15
10,633.75
1956 13,250.00
13,250.00
12,103.75
1957
13,250.00
13,250.00
13,232.50
1958
Bonus
7,032.22
7,032.22
5,203.00
Salary 15,900.00
15,900.00
15,900.00
Total
$22,932.22
$22,932.22
$21,103.00
1959
Bonus
$12,536.41
$12,536.41
$11,000.00
Salary 15,600.00
15,600.00
15,600.00
Total
$28,136.41
$28,136.41
$26,600.00
1960
Bonus
$11,069.00
$12,538.54
$10,000.00
Salary 15,600.00
15,600.00
15,600.00
Total
$26,669.00
$28,138.54
$25,600.00
1961
Bonus
$ 7,695.14
$ 5,434.36
$ 2,600.00
Salary 15,600.00
15,600.00
15,600.00
Total
$23,295.14
$21,034.36
$18,200.00
1962
Bonus
$15,000.00
Salary 31,200.00 $15,600.00
$10,400.00
Total
$46,200.00
1963
Com. * *182 $ 3,552.85
$ 3,540.94
Salary $31,200.00
15,300.00
10,400.00
Total
$31,200.00
$18,852.85
$13,940.94
1964
Com.
$13,130.43
$13,901.67
Bonus
$15,000.00
Salary 31,800.00
15,900.00
10,600.00
Total
$46,800.00
$29,030.43
$24,501.67
1965
Com.
$13,242.12
$18,613.58
Bonus
$15,000.00
Salary 31,200.00
15,600.00
10,400.00 Total
$46,200.00
$28,842.12
$29,013.58
1966
Com.
$12,929.13
$28,846.94
Bonus
$15,000.00
Salary 31,000.00
15,600.00
10,400.00
Total
$46,000.00
$28,529.13
$39,246.94
During the years 1958 through 1961 the Company's method of compensation for each of the individual officers was a system of basic yearly salary payments determined near the beginning of the year and a bonus, determined at the end of the year. The minutes of a special meeting of the board of directors which was held on December 1, 837 1960, and another which was held on December 1, 1961, reveal that the bonuses in the latter years were given only after a detailed review of the financial statements and consideration of the services performed. The directors examined the amount of earnings and profits at the end of every three months, after the accountant for the corporation had taken an inventory. When the above-mentioned meetings were held to determine the amount of bonuses for the year, the amount of earnings and profits earned during the last quarter of the year had not yet been determined, and could only be estimated. Since each of the three officers of the Company was involved in all major aspects of the corporate business, and each one spent a different amount of time selling ink, the compensation for services which was paid in 1960 and 1961 was not based upon a percentage *183 of sales or corporate earnings. In fact, the total officers' compensation paid in 1960 and 1961 amounted to only 13.9 percent and 10.5 percent of the net sales, respectively, whereas equivalent calculations with respect to 1958 and 1959 amounted to 16.13 percent and 16.9 percent, respectively. During the period from 1952 through 1961, the total compensation which was paid by the Company to employees other than officers gradually increased from $19,180.90, representing 12.9 percent of net sales, to $132,117, or 22.2 percent of net sales. By 1960 and 1961 the Company had increased the size of its staff to approximately 25 employees. During 1960 and 1961 there were only two salesmen working for the Company other than the officers. One of these men left the Company some time during 1961 because he was not successful in making sales. The other one received a salary of approximately $13,000 a year. His contribution to the success of the business was small in comparison to the services performed by each of the officers. Neither of these salesmen received a bonus during the taxable years. Alfred W. Rexford, the president of one of the Company's competitors, who had been in the ink business *184 for 44 years, had been familiar with the operations of the Company since its organization in 1946. Rexford performs essentially the same duties for his company as the petitioner-officers performed in 1960 and 1961. He was of the opinion that each of the petitioner-officers possessed unique qualities and combinations of skills which distinguished them from other men occupying similar positions in the ink business. He had recently tried to hire both Glenn and Bradt but had been unsuccessful. In 1960 and 1961 Rexford received a salary of $30,000 plus a bonus amounting to 10 percent of his company's profits before taxes. The gross receipts of his company during those years were approximately one-half of the amount of petitioner-Company. Rexford was of the opinion that reasonable compensation (including a bonus) during each of these years for Glenn, Killian, and Bradt, would have been $30,000, $28,000, and $26,000, respectively. As noted previously, the actual amounts of compensation paid to these petitioner-officers were $26,669, $28,138.54, and $25,600, respectively in 1960, and $23,295.14, $21,034.36, $18,200, respectively, in 1961. Since its inception, the Company has grown rapidly, *185 and generally has not had enough physical space in which to comfortably operate the business. The Company has never declared or paid a dividend, and one of the reasons for this policy has been to save money for the physical expansion of the business. Over the years the Company has in fact expanded and recently purchased property to accommodate its continuing growth. Paul F. Ryan has been the certified public accountant for the Company since 1947 and has been paid on a fee basis for his services. During 1960 and 1961 he made all the ledger entries, prepared the tax returns, and, in general, was personally familiar with the financial transactions of the Company. During the taxable years in issue the Company employed two distinct methods for the payment of expenses incurred by its officers and other employees for travel, entertainment, and gifts, in addition to certain expenses for other miscellaneous items. Some of these expenses were paid directly by the Company, usually when the expenses were large or when the employee had used a credit card bearing the Company's name. The other expenses were paid by the employees, who were later reimbursed by the Company pursuant to the system set *186 forth below. In 1959 the Company established a system for the reimbursement of employees for their expenses under which the employees were required to submit "vouchers" before 838 receiving payment from the Company. The "vouchers" were printed forms on which the employee was asked to supply the following information: [2] the item for which the expense; the applicable category of the expense (the stated categories included both "Travel" and "Entertainment"); and the name of the customer to whom the expense was attributable, if applicable. Each "voucher" was submitted to the Company's accountant, who subsequently checked it for mathematical accuracy. In some instances the employees also submitted documentary evidence of their expenses to the accountant. The accountant then wrote a check for the amount of the claimed expenses and submitted the "voucher" and check to Glenn, the secretary - treasurer, for his approval. At no time during the years in question were any questions raised by the accountant, Glenn, or either *187 one of the other officers of the corporation with respect to the legitimacy or propriety of the expenses claimed for reimbursement on any of the "vouchers" submitted by the petitioner-officers. The following schedule [3] *190 sets forth the amounts deducted as traveling and entertainment expenses by the Company and disallowed by the respondent with respect to each of the petitioner-officers during the years in issue: *10 HERBERT BRADT *10 1960
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
$361.50
Train
$30.00
Car Expense
104.26
Misc.
36.16
Entertainment
$2,525.24
B. Direct:
Gulf Oil Corp.
563.87
Atlantic Refg. Co.
17.35
Car License 10.00
Total $725.48
$2,525.24
$397.66
Total Amount Claimed $3,648.38
Amounts Disallowed:
1/5 Travel
$145.09
Entertainment
$2,525.24
1/3 Meals $120.50
Total $145.09
$2,525.24
$120.50
Total Amount Disallowed $2,790.83 *10 HERBERT BRADT *10 1961
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
$422.00
Car Expense
$159.15
Xmas Liquor
211.37
Entertainment
$735.00
B. Direct:
Gulf Oil Corp.
528.11
Car License
10.00
Car Insurance
139.94
Amal. Litho. Assn.
10.00
Atlantic Refg. Co. 11.17
Total $848.37
$735.00
$643.37
Total Amount Claimed $2,226.74
Amounts Disallowed:
1/5 Travel
$169.67
Entertainment
$735.00
Xmas Liquor
$211.37
1/3 Meals 141.00
Total $169.67
$735.00
$352.37
Total Amount Disallowed $1,257.04
*188 *10 JAMES J. GLENN *10 1960
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
$ 489.54
Tolls, Parking, Phone
$ 205.19
Train
13.85
Litho Club
210.05
Ink Production Club
151.75
Prtg. Ink Makers Assoc.
131.53
Air Travel
305.55
Hotel
257.09
Taxi
6.40
Tips
50.80
Misc.
9.50
Car Rental
151.23
Entertainment
$1,567.80
B. Direct:
Atlantic Refining Co.
582.07
J. E. Caldwell Co.
27.50
Esso Oil Co.
9.00
Calif. Oil Co.
2.56
Koelle-Greenwood Ford
390.75
Mobil Oil Co.
105.96
Auto License
14.00
Car Rental
16.46
Gulf Oil Corp.
42.54
Air Line
144.32
Sears & Co.
3.94
Dick & George 20.34
Total $2,297.77
$1,588.14
$1,023.81
Total Amount Claimed $4,909.72
Amounts Disallowed:
1/5 Travel
$ 459.55
Entertainment
$1,588.14
1/3 Meals
$ 163.18
Total $ 459.55
$1,588.14
$ 163.18
Total Amount Disallowed $2,210.87 840 *10 james j. glenn *10 1961
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
$ 397.65
Tolls
$ 42.50
Parking
45.89
Telephone
26.90
Misc.
26.05
Litho Club
202.65
Prtg. Ink Makers Assoc.
166.38
Ink Production Club
167.00
Tips
53.35
Car Wash
32.92
Notary Fees
4.00
Xmas Liquor
160.81
Xmas Cards
10.00
Entertainment
$478.55
Gasoline
5.00
B. Direct:
Esso Std. Oil
67.37
Mobil Oil Corp.
44.34
Atlantic Refg. Co.
948.26
Car License
10.00
Dick & George (Beer)
50.96
Koelle-Greenwood Ford
352.62
Gulf Oil Corp.
61.20
Spaeth Motor Co.
290.87
American Oil Co.
26.88
Air Line
19.53
Car Insurance
129.12
M.I.T. Club
5.00
Human Events (Gift Sub.) 142.50
Total $2,129.85
$478.55
$1,359.90
Total Amount Claimed $3,968.30
Amounts Disallowed:
1/5 Travel
$ 425.97
Entertainment
$478.55
Xmas Liquor
$ 160.81
Xmas Cards
10.00
Human Events (Gift Sub.)
142.50
1/3 Meals
132.55
Total $ 425.97
$478.55
$ 445.86
Total Amount Disallowed $1,350.38
*189 841 *10 JAMES T. KILLIAN *10 1960
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
985.84
"Just One Break"
75.00
Car Wash
$ 7.66
Telephone
8.45
Parking
5.90
Tolls
8.95
Tips
4.00
Hotel
35.74
Car Repair
11.02
Misc.
5.26
Air Insur.
7.50
Bus
5.00
Taxi
15.40
Xmas Liquor
308.71
Xmas Cigars
37.21
Entertainment
$2,066.84
B. Direct:
Esso Std. Oil Co.
168.26
Atlantic Refg.
922.00
Emerson Hotel
104.18
Litho Club
230.00
Dick & George (Beer)
15.31
Koelle-Greenwood Ford
909.06
Car License
10.00
Gulf Oil Corp.
29.21
American Oil Co.
311.97
Air Line
297.00
Craftsmen Club
87.50
Xmas Cards
100.00
Xmas Gifts --
Friendl iness, Inc. 95.93
Total $2,845.35
$2,066.84
$1,956.71
Total Amount Claimed $6,868.90
Amounts Disallowed:
Travel
Entertainment
Selling Expenses
Total
1/5 Travel
[1] $509.67
Entertainment
$2,066.84
Xmas Liquor
$308.71
Xmas Cigars
37.21
Xmas Gifts
95.93
1/3 Meals 328.61
Total $509.67
$2,066.84
$770.46
Total Amount Disallowed $3,346.97 842 *10 JAMES T. KILLIAN *10 1961
Items Claimed:
Travel
Entertainment
Selling Expenses
Total
A. Vouchers:
Meals
$ 878.36
Car Expense
$ 124.51
Tolls
23.90
Parking
45.20
Telephone
9.10
Railroad
103.69
Hotel
209.67
Tips
9.00
Taxi
10.05
Litho Club
56.60
Golf Outing
$ 34.58
Entertainment
3,539.23
B. Direct:
Atlantic Refg. Co.
$958.35
Car License
10.00
Hotel
32.20
American Oil Co.
710.61
Koelle-Greenwood Ford
596.83
Litho Club
20.00
Esso Std. Oil
274.29
Air Line
201.14
Mobil Oil Co.
6.55
Gulf Oil Corp.
54.27
Car Ins.
126.12
Xmas Liquor
389.48
Gifts - Friendliness, Inc.
243.71
Craftsmen Club
35.00
Entertainment 228.00
Total $3,496.38
$3,801.81
$1,632.25
Total Amount Claimed $8,930.44
Amounts Disallowed:
Travel
Entertainment
Selling Expenses
Total
1/5 Travel
$699.27
Entertainment
$3,573.81
Xmas Liquor
$389.48
Xmas Gifts
243.71
1/3 Meals 292.79
Total $699.27
$3,573.81
$925.98
Total Amount Disallowed $5,199.06 843 Due to a high degree of competition in the ink industry during the years in question, the Company found that it was necessary to entertain its customers. In most cases, one of the petitioner-officers would take one or more individuals, who were responsible for buying ink for a particular customer, to lunch or dinner. In this way it was possible to talk to the customer's representative about the Company's ink products for a couple of hours without being disturbed. During the years in issue, the Rexford Company, a competitor mentioned previously, spent an amount equal to between four and five percent of total sales on traveling and entertainment *191 expenses. The Rexford Company has, on occasion, spent as much as six percent. Petitioner-Company claimed a total of $26,613.15 and $22,040.89 for travel and entertainment expenses on its income tax returns for 1960 and 1961, respectively. These amounts represented about 4.6 percent and 3.7 percent of total sales in the respective years. The portion representing the amount claimed solely for officers' expenses was $15,427 in 1960, and $15,125.48 [4] in 1961. In August 1961, Bradt informed the Company that he would like to have his shares of stock redeemed but that he wanted to stay with the Company as an employee. The Company then employed an independent certified public accountant, Harry K. Cohen and Company, to make an audit as of September 30, 1961, for the purpose of placing a valuation upon the stock. Subsequently, Killian also indicated a desire to sell his stock back to the corporation and also remain an employee. The audit established that the fair value of each share of common stock was $5,286.60. At some undetermined time soon after 1961 *192 all of the shares of Bradt and Killian were redeemed. It has been previously stated that the respondent disallowed the deduction by the petitioner-Company of traveling and entertainment expenses paid to or for Killian, Glenn, and Bradt, in the amounts of $3,346.97, $2,210.87, and $2,790.83, respectively, in 1960, and $5,199.06, $1,350.38, $1,257.04, respectively, in 1961. Likewise, in his notices of deficiency to each of the petitioners Killian, Glenn, and Bradt, for the taxable years 1960 and 1961, respondent increased the gross income of each by the above respective amounts. In his notice of deficiency with respect to the petitioner-Company respondent also disallowed the deduction of $30,000 in 1960, and $7,800 in 1961, representing a portion of the total amounts paid as compensation to Killian, Glenn, and Bradt in the respective years. It was determined that payments made to each of these three petitioner-officers, to the extent of $10,000 in 1960, and $2,600 in 1961, "[did] not constitute a reasonable allowance for salaries or other compensation for personal services actually rendered within the purview of section 162(a)(1)" of the 1954 Code. In his income tax returns for the years *193 1960 and 1961, petitioner Glenn deducted $1,025.50 and $1,001, respectively, for charitable contributions. In his notice of deficiency, respondent disallowed the deduction to the extent of $666.50 in 1960, and $459 in 1961. In addition to amounts conceded by respondent to have been given to charity, Glenn made the following contributions in both 1960 and 1961. During these years Glenn and his family attended a Sunday service at the Mother of Divine Providence Church almost every week. Each week Glenn made a cash contribution of $3.25 as follows: Glenn put $2 in the plate and gave his wife 50 cents, and each of his three sons 25 cents, to put in the plate. Also, in each of the years in issue, Glenn's wife provided round trip automobile transportation five days each week for one month for a group of nuns who were conducting a summer 844 program for children at the church. There is no evidence of record as to the number of miles traveled. Glenn also contributed $25 each year for liquor and cakes to be used as prizes in church raffles. In his income tax return for 1961, Glenn deducted as a casualty loss $112.32, representing the cost of a new rotating television antenna to replace his *194 old antenna which was blown down in a windstorm. Respondent disallowed this deduction in full. Glenn estimated that the original antenna had been bought and attached to his house about two years prior to his purchase of the house in 1955. While Glenn owned the house, the antenna had blown down on one or two occasions prior to its final destruction in 1961. Glenn estimated that the destroyed antenna had originally cost in excess of $100. Ultimate Findings of Fact 1. The amounts paid by the Company in 1960 and 1961 as salaries and bonuses to each of the petitioners Bradt, Glenn, and Killian constituted reasonable compensation for services rendered. 2. Traveling, entertainment, and gift expenses paid by the Company which were attributable to Bradt, Glenn, and Killian represented personal expenses not proximately related to the business to the extent of $770.64, $940.35, and $1,399.41, respectively, in 1960, and to the extent of $499.94, $716.89, and $1,833.46, respectively, in 1961. 3. Glenn made contributions to charity in 1960 and 1961 in the total amounts of $569 and $752, respectively. Opinion The first issue which we must consider is whether certain amounts paid by the petitioner-Company *195 to its officers (petitioners Glenn, Killian, and Bradt) during the taxable years 1960 and 1961 are deductible by the Company under section 162(a)(1), I.R.C. 1954, as reasonable compensation for services rendered. Petitioner has the burden of showing that these amounts were in fact reasonable and, thus, ordinary and necessary expenses. Botany Mills v. United States, 278 U.S. 282 (1929). The issue is factual. During each of the taxable years 1960 and 1961 the Company paid a salary of $15,600 to each of the three petitioner - officers. In December of each of these years, the board of directors, which consisted of Glenn, Killian, and Bradt, resolved that the Company should pay them bonuses in the amounts of $11,069, $12,538.54, and $10,000, respectively in 1960, and $7,695.14, $5,434.36, and $2,600, respectively in 1961. Respondent has taken the position that the bonuses paid to each officer, to the extent of $10,000 in 1960 and $2,600 in 1961, did not constitute reasonable compensation and were more in the nature of year-end distributions of dividends on the stock held by these officers. Bonus payments are governed by the rules generally applying to other compensation payments, and are *196 deductible to the extent the entire compensation, including the bonus, represents reasonable payment for services actually rendered. Section 1.162-9, Income Tax Regs.
Bearing in mind that each of the officers mentioned above owned 32 percent of the outstanding stock in the corporation, we have subjected the facts relevant to the reasonableness of their compensation to close scrutiny. We have concluded that the total amounts paid to these individuals as compensation were reasonable, and were in fact payments purely for services. Section 1.162-7(a), Income Tax Regs. We see no need to set forth in detail the analysis which led us to the ultimate finding of fact which we have made. The factors which are discussed below represent only some of those which we considered. All three of the petitioner-officers were well qualified to perform their duties during the years in question. Glenn and Killian had both graduated from M.I.T. in 1935 after collaborating on an important thesis concerning the physical measurement of color. During the ensuing 11-year period Glenn continued to work with color measurement, and Killian worked for several companies where he gained a considerable amount of experience *197 in making and selling inks. In 1946, Glenn and Killian started the petitioner Glenn-Killian Color Company. In 1952, they were joined by petitioner Bradt, a lithograph printing specialist who had been the superintendent of one of the largest offset printing plants in Philadelphia, Pennsylvania. During the taxable years 1960 and 1961, Killian, Bradt, and Glenn each owned 32 percent of the common stock of the Company and held the offices of president, vice president, and secretary-treasurer, respectively. Although Killian, Bradt, and Glenn were primarily responsible for sales, 845 research and development, and production, respectively, each of these men was involved to some extent in all of these areas of work in a supervisory capacity. The ability to perform successfully in all of these areas of work represented a unique combination of skills. It appears that very few "technical" men in the ink business are also good salesmen. Our Findings demonstrate that the Company was highly successful. The gross receipts increased from $31,832.05 in 1946 to $594,461.25 in 1961. A large part of the Company's success after 1955 was directly attributable to the invention of the "Offset Color Formulator" *198 by Glenn and Killian, a unique combination of a color catalogue and color matching system which has since been substantially adopted by most ink companies. When the history of compensation paid to officers is viewed in the light of the Company's high degree of financial success resulting from their efforts, it appears that the amount of compensation paid to the officers during the first decade of operations was relatively low. Furthermore, we find that the increases in compensation paid thereafter, including the taxable years in issue, do not appear to have been unwarranted when contrasted with the significant increases in gross receipts in those years. At the trial, Alfred W. Rexford, the president of one of the Company's competitors, testified with respect to the reasonableness of the compensation in issue herein. He was generally familiar with both the operations of the petitioner-Company and capabilities of the petitioner-officers. Rexford, who performed essentially the same duties for his company as the petitionerofficers performed during the taxable years, received a salary of $30,000 plus a bonus amounting to 10 percent of his company's profits before taxes. The gross receipts *199 of Rexford's business were approximately half of those received by the petitioner-Company during the years in issue. Rexford was of the opinion that reasonable compensation (including a bonus) during each of these years for Glenn, Killian, and Bradt, would have been $30,000, $28,000, and $26,000, respectively, which amounts were equal to or in excess of the amounts actually paid by the Company. It should also be pointed out that one of the Company's salesmen, who owned no stock in the corporation, received a salary in the approximate amount of $13,000 in each of the taxable years in issue. We have found that his contribution to the business was small in comparison to the services performed by each of the officers. We cannot agree with the respondent's determination, which would allow the Company to deduct as compensation amounts only a few thousand dollars higher than $13,000 for each of the petitioner-officers in each year in question. Respondent's contention is that the amounts disallowed did not represent reasonable compensation but were more in the nature of distributions of dividends upon the stock held by the officers. Respondent places great emphasis on the fact that the Company *200 has never paid a dividend. We have found, however, that since its inception, the Company has grown rapidly, and generally has not had enough physical space in which to operate the business, and it appears that the money which might have been available for dividends has been spent or set aside for physical expansion. Respondent also emphasizes the fact that a large part of the total compensation paid to the officers in each year was in the form of a year-end bonus, contending that this is indicative of a mental disposition on the part of the officer-directors toward a distribution of profits. We note, however, that the corporate minutes state that the bonuses were authorized not only after a detailed review of the financial statements, but after consideration of the services performed. Furthermore, the parties have in fact stipulated that the Company's method of compensation for each of the individual officers was a system of basic yearly salary payments determined near the beginning of the year and a bonus, determined at the end of the year. The officers each owned 32 percent of the Company's stock, yet neither the bonuses nor the salaries were in equal amounts in the years before *201 us. We are unable to conclude that the bonuses were, in part, distributions of dividends merely because they were determined at the end of the year. In light of the factors discussed above, and after a careful review of all the evidence of record with respect to this issue, we are unable to agree with respondent's contentions. We conclude and hold that the total amounts paid as compensation, including salaries and bonuses, to each of the petitioner-officers during the years in question represented reasonable compensation for services rendered. 846 We turn now to the question of whether the respondent properly disallowed the deduction by the Company of a portion of certain amounts paid during 1960 and 1961 for traveling, entertainment, and gift expenses incurred by each of the petitioners Bradt, Glenn, and Killian. Respondent claims that the amounts disallowed with respect to each of these petitioner-officers represent personal expenses and are therefore includable in the gross income of each officer. The petitioners have the burden of proving these were ordinary and necessary business expenses within the meaning of section 162(a), I.R.C. 1954. [5] *202 The expenses in issue were either paid directly by the Company, or paid by the individual officers, who were then reimbursed by the Company. In order to obtain reimbursement for the latter expenses the officers were required to submit certain information on a printed form called an "expense voucher" to the accountant for the Company. These "vouchers" provided spaces in which the officers and other employees were supposed to indicate the item for which the expense was incurred, the amount of the expense, the applicable category (e.g., "Travel", "Entertainment"), and the name of the customer to whom the expense was attributable, if applicable. Before reimbursement was made, the "vouchers" were checked by the accountant for mathematical accuracy and "approved" by Glenn, who was secretary-treasurer of the Company; however, neither ever question the legitimacy or propriety of any expense claimed for reimbursement by an officer. At the trial petitioners introduced a sample "expense voucher" for each of the officers, but they were introduced for the sole *203 purpose of showing the form of the "vouchers." The petitioners chose not to introduce any "vouchers" for the purpose of substantiating the expenses in issue herein. Furthermore, the petitioners did not introduce any bills, receipts, or canceled checks which might have helped to substantiate either the reimbursed expenses or the expenses which were paid directly by the Company. Instead, at trial petitioners merely submitted an itemized list of expenditures for each officer. The items contained in these lists are set forth in our Findings of Fact. The lists were prepared by the Company's accountant from the books and records of the Company. With a few minor exceptions, no evidence was introduced to prove whether any individual expense item was attributable to a particular customer, when the expenditure was made, or whether any specific expenditure was made for a business purpose. At the trial, each officer simply made a blanket statement to the effect that the accountant's list represented an accurate statement of his expenses. In determining the deficiencies herein, respondent listed all of the items of expense which he considered to be connected with "travel", and took the position *204 that one-fifth of the total amount represented personal expenses of the officers. He also took the position that one-third of the items categorized by petitioners as "meals" were personal expenses. The evidence presented with respect to these items was so general and of such a summary and conclusory nature that, in our opinion, petitioners have wholly failed to carry their burden of proof. Reginald G. Hearn, 36 T.C. 672 (1961), affirmed 309 F. 2d 431 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963). We therefore sustain the respondent's determination with respect to these items. Respondent also determined that all but one of the items listed by petitioners simply as "entertainment", [6] *205 and certain Christmas gifts, were wholly personal in nature. Petitioners have convinced us, however, that it was necessary to entertain and give Christmas presents to their customers during the years in question. Applying the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), we have concluded that 80 percent of these expenses were ordinary and necessary business expenses of the company and did not constitute personal expenses of the officers.
In light of the above, we conclude and hold that the petitioner-Company is entitled to deduct traveling, entertainment, and gift expenses of the petitioner-officers in the amounts of $12,316.60 in the taxable year 1960, and $12,065.19 in 1961, and that the following amounts represent personal expenses paid by the Company which are 847 includable in the gross income of the petitioner-officers: 1960
1961
Bradt
$ 770.64
$ 499.94
Glenn
940.35
716.89
Killian
1,399.41
1,833.46
Another issue which we must decide is whether respondet properly disallowed deductions for charitable contributions claimed by petitioner Glenn under section 170, I.R.C., 1954 to the exent of $666.50 in 1960, and $459 in 1961. We find that, in addition to amounts already allowed by respondent, Glenn made regular cash contributions in the amount of $3.25 per week to his church, and contributed $25 each year for liquor and cakes to be used as prizes in church raffles. Also, in each of the years in issue, Glenn's wife provided round-trip automobile transportation *206 five days each week for one month for a group of nuns who were conducting a summer program for children at the church. No evidence was presented to show the precise number of miles traveled by Glenn's wife. Applying the rule of Cohan, supra, we conclude and hold that, in addition to amounts already allowed by respondent, petitioner Glenn is entitled to a deduction of $210 for the above-mentioned contributions in each of the taxable years 1960 and 1961. The final issue for our decision is whether respondent properly disallowed petitioner Glenn's deduction of $112.32 as a casualty loss in 1961, representing the cost of a new television antenna to replace his old antenna which was blown down and totally destroyed in a windstorm. The proper measure for the amount of this particular casualty loss would have been the difference between the fair market value of the old antenna immediately before and immediately after the windstorm. Section 1.1677(b), Income Tax Regs. Although Glenn did not originally purchase the old antenna, which was on his house when he bought the latter, he estimated that it had originally cost in excess of $100 and that it was approximately seven years old when it was *207 destroyed in 1961. The old antenna had been blown down on two occasions prior to the windstorm in 1961, however no evidence was presented to show the extent of damage on those occasions. Further, no evidence was introduced for the purpose of establishing the fair market value of the property immediately before the windstorm. On the basis of this information alone, we cannot determine the extent of damage in 1961. We therefore conclude and hold that the respondent's determination on this issue should be sustained. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Glenn-Killian Color Company, Docket No. 838-67; Herbert Bradt and Irene P. Bradt, Docket No. 847-67; and James T. Killian and Marjorie A. Killian, Docket No. 888-67.↩
*. Commission
2. In some instances the employees merely submitted handwritten or typewritten notations which were later transcribed on to the printed "vouchers" by the Company's accountant.↩
3. The subheadings "Vouchers" and "Direct" represent the two aforementioned methods employed by the Company in paying the expenses of employees. The former was a method of reimbursement, whereas, under the latter method the Company made a "direct" payment to the creditor, e. g. when the employee used a credit card bearing the Company's name. The categories "Travel," "Entertainment," and "Selling Expenses" are those used by the respondent in making his determination of deficiency and are included herein only to show the method of his determination.↩
1. It appears that respondent incorrectly computed 1/5 of $2,845.35 as $509.67, instead of $569.07, in determining the amount of "travel" expense disallowed.↩
4. The petition in Docket No. 838-67 and certain exhibits of the parties contain a miscalculation and show this total figure to be $15,115.48.↩
5. Petitioners are not required to satisfy the strict substantiation requirements of section 274 (d), I.R.C. 1954↩, which applies only to taxable years ending after December 31, 1962.
6. Respondent also included in the "entertainment" category an expense in 1960 attributable to Glenn which petitioners listed as "Dick & George", and an expense in 1961 attributable to Killian which was listed as "Golf Outing."